(Reap. Dec. 8702)

FREEDMAN & SLATER, INC. *v.* UNITED STATES

Entry Nos. 704314; 704313.

(Decided on remand [A. R. D. 64] November 23, 1956)

*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel); *Barnes, Richardson & Colburn* (*Hadley S. King* of counsel); and *Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel), associate counsel; for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

MOLLISON, Judge: These appeals for reappraisement are before me on an order of remand by the second division of this court, reported as *United States* v. *Freedman & Slater, Inc.*, 35 Cust. Ct. 456, A. R. D. 64. The order of remand was not limited, but was stated to be "for all purposes."

The state of the record up to the time of the remand is as set forth in the writer's previous opinion, reported as *Freedman & Slater, Inc.* v. *United States*, 31 Cust. Ct. 438, Reap. Dec. 8274, and need not be set forth again here.

At the hearing on remand, certain corrections of typographical errors were made in the transcript of the record and one change was made in a point of agreement entered into at a pretrial conference. None of the changes alters the basic positions and contentions of the parties or the effect of the evidence already offered, as set forth in Reap. Dec. 8274.

In addition to that record, however, there were offered and received in evidence, without objection, three reports (less certain deletions), made by a Treasury representative, which were marked collective exhibits 19, 20, and 21, detailing the results of an investigation made in Argentina, and, as exhibit 22, an extract of a letter, embodying part of a hypothetical question submitted by the office of the Assistant Attorney General to the Commissioner of Customs and referred to in the said reports.

Exhibits 19 to 22, inclusive, therefore, constitute the only evidence offered which was not before this court at the time the opinion in Reap. Dec. 8274 was prepared. A perusal of both the enumerated exhibits and a summary of collective exhibits 19, 20, and 21, prepared by counsel for the defendant, is convincing that they not only fail to support the position of the defendant in this case, but affirmatively support the contention made by the plaintiff and the conclusions reached by this court in the prior decision.

As stated in Reap. Dec. 8274, the question at issue is—

* * * whether the foreign and export values, as defined in the tariff act, as amended, of merchandise such as or similar to that in issue (i. e., wet salted frigorifico sound bull hides *which had shrunk to the extent of the percentages returned by the appraiser*) included the amounts in Argentine currency represented by the percentage advances made by the appraiser, or whether the foreign and export values of such or similar merchandise did *not* include the said amounts represented by the percentage advances made by the appraiser. [Italics quoted.]

The matter contained in collective exhibits 19 to 21, inclusive, consists of the detailed results of interviews and answers to questions formulated by defendant's counsel and put by or through the Treasury representative to officials of the five large frigorificos accounting for 90 per centum of all hides sold for home consumption or export in Argentina, as well as to Argentine Government officers.

The questions went into minute detail as to many matters which are not material to the issue here, such as the situation which would obtain if the delivered hides contained *excessive* moisture. Inasmuch as the imported hides had *lost* moisture, and the defendant contends that the per unit value of the hides had increased as the result of that loss, inquiry as to the effect of *excessive* moisture hardly seems germane to the issue.

However, as reported in collective exhibits 20 and 21, one of the questions propounded by defendant's counsel through the Treasury representative reached the basic issue involved. This question, denominated "Question No. 1," was put to the officials of the five largest frigorificos in Argentina and reads as follows:

Question No. 1. When *shrinkage* takes place, or when hides contain *less* humidity than normal, has it been the custom generally to adjust the *weight* of the hides? Would there result a higher price per unit or a weight adjustment? [Italics quoted.]

Apparently only four replies were received. Three of these answered "No" to both parts of the question. However, each respondent went further and indicated that, if the *average* or *extreme* weights should not be in line with those stipulated at the time of sale, an adjustment would be made *in favor of the buyer*. This, of course, indicates that shrunken hides were worth less than hides of normal moisture content.

The fourth reply reads as follows:

When hides were delivered containing less humidity than normal, *neither the weight of the hides nor the price was adjusted,* in other words, the buyer obtained the benefit of the drier condition of the hides. If because of the less than normal moisture carried by the hides the average weights of the delivery was not in line with the estimated average weight or extreme average weights stipulated at time of sales, adjustment was made as will be explained hereunder in our reply to query (4). [Italics mine.]

At this point, it must be emphasized that the appraised value here under contest was based upon a claimed *increase* in the value *per unit of 100 kilos, as landed,* of the hides because *each unit of 100 kilos, as shipped,* had shrunk during the voyage of importation. There is no claim or question that the *average* weight of the hides was not within the tolerances or ranges of weights stipulated in the contract, nor is there any claim or question that the *extreme* or *extreme average* weights were not within the stipulated tolerances. The question of the value *per unit of 100 kilos* has nothing whatsoever to do with the question of delivery of hides which do not fall within the average weight or extreme weight called for by the contract. The "average weight" and "extreme weight" referred to can only relate to the *average weight of the hides* and the *lightest or heaviest hide* in the shipment, if such weights were stipulated at the time of sale.

For example, although the average or extreme weights of the hides involved in these cases do not seem to have been covered by the contract (defendant's exhibit 1), the confirmation (defendant's exhibit 2) and the consular invoices call for "average shipping weight," in the case of reappraisement No. 171098–A, of "36/40" kilos, and, in the case of reappraisement No. 171699–A, of "37/41" kilos. This means that weight of the average hide in the shipment was to be between those two figures, as shipped, and that no hide should, as shipped, exceed, either on the light or the heavy side, those two figures in each case.

It will be seen, therefore, that the first sentence in the reply quoted above answers the real question at issue in this case, i. e., that, when hides were delivered containing less humidity than normal (namely, shrunken hides), *neither the weight of the hides nor the price was adjusted.* The second sentence, relating to the average and extreme weights, is not probative of any fact material to the issue, *because there is no issue as to average and extreme weights here involved.*

However, even if the facts with respect to average and extreme weights of the hides were material to the issue, it is clear from the references made in the answers to the questions propounded by defendant's counsel to the officials of the frigorificos that, if the average or extreme weights were on the light side, as would happen in the case of evaporation of moisture from hides, the seller would have to replace the light hides, or, if unable to do so, would have to adjust the price per unit *downward,* in accordance with the rules of the Chamber of Livestock By-Products of the Buenos Aires Stock Exchange. This, again, indicates that hides with less than normal moisture were worth *less* than hides of normal moisture content.

In the previous decision in this case, Reap. Dec. 8274, it was said:

\* \* \* We determine the value of the hides under appraisement by the value in the foreign market of such or similar hides, i. e., hides which had shrunk to the extent of the percentages returned by the appraiser.

Apparently, in order to secure information upon which such a determination could be made, counsel for the defendant formulated an assumed state of facts, which would comport with the foreign market situation referred to above, as follows (exhibit 22):

Assuming you have two packs (a) and (b), of wet, salted frigorifico sound hides (bull or other types), like as to quantity and quality, which, following the pack closings, have been in frigorifico storage for 22 days and 70 days, respectively; further, assume that as of the date both packs are freely offered for sale in Argentina by the frigorifico, in the usual wholesale quantities, and in the ordinary course of trade, the then estimated frigorifico shipping weight for pack (b) is 93.5 lbs. due to evaporation of moisture, and the estimated frigorifico shipping weight for pack (a) is 100 lbs.; assume the loss of weight from the time of the original packing of both packs does not affect the quantity or quality content of such hides.

It is quite evident that pack (a) was to represent hides, such as or similar to those in issue, in their condition at the time they were actually sold and delivered in the foreign market at the frigorifico, while pack (b) was to represent such or similar hides which had shrunk in the foreign market at the frigorifico to the extent of the percentages of shrinkage returned by the appraiser in these cases, an average of about 6.5 per centum. The 22 days of storage of pack (1) evidently represent the time, referred to in exhibit 19, during which hides, after processing, were allowed to purge and drain and during which time they lost weight through elimination of humidity and dehydration of grease, after which, having been so cured, they were considered to be in good condition for sale and fit for delivery. The 70 days of storage pack (b) evidently represent such curing period, plus the time which, in the case of the hides at bar, was consumed in the voyage of importation.

The assumed state of facts was followed by five hypothetical questions put to the officers of the frigorificos, the first two of which are as follows:

QUERY: (1) Based upon the foregoing assumptions, would both pack (a) and pack (b) be so offered for sale by the frigorificos at the same basic unit sale price?

QUERY: (2) If not, would the offered basic *unit* sales price of pack (b) be increased so as to equal the basic *unit* sales price offered with respect to pack (a) plus an amount representing the loss of weight of the 6.5 lbs. of moisture? [Italics quoted.]

The officials of the four frigorificos who answered the foregoing two queries indicated that one answer would cover both questions. Their answers are similar in content, and the following is typical:

Usually both packs were offered at the same asking price but under favorable market conditions for the seller, a somewhat better price was occasionally obtainable for pack (b). (Subexhibit 5, coll. ex. 20.)

Inasmuch as it clearly appears from the evidence previously submitted in the case that, at the time of exportation of the involved hides, the *only* price at which such merchandise was offered, bought, and sold in Argentina was 78 Argentine pesos per 100 kilos of weight of hides at the frigorifico, it can be safely held that the "favorable market conditions for the seller" did not exist at the times here pertinent, and the usual situation referred to in the first part of the answer obtained.

Query No. 3 assumed that query No. 2 had been answered in the affirmative and asked for dates between which such frigorifico trade customs or practice had been established and were in effect. It will be noted that query No. 2 was *not* answered in the affirmative, but, at any rate, the respondents said that dates were not specific or available, meaning, presumably, dates when favorable market conditions for the seller obtained.

Query No. 4 was as follows:

Was the trade custom or practice true with respect to all variations in weight other than variations considered to be purely negligible?

and the following answer is typical:

Insofar as excessive moisture is concerned, no adjustment is made for negligible differences. Only in the case of differences in the average or extreme weights, are adjustments made in favor of the buyer and then on the basis of the "Estilo de Plaza y Embarque" no matter how small the difference may be. (Enclosure, coll. ex. 21.)

It is to be noted that the *only* variations in weight for which adjustments are provided are those in the case of differences in the *average* and *extreme* weights, which are *not* the weigh *per unit of sale,* and, even in those cases, adjustments were made "in favor of the buyer," indicating a *less* value for hides exhibiting differences in the average and extreme weights than for hides which were within the stipulated weights.

In aswer to query No. 5 the "Estilo de Plaza y Embarque" (Market and Shipment Style) of the Cámara de Subproductos Ganaderos de la Bolsa de Comercio de Buenos Aires (Chamber of Livestock By-Products of the Buenos Aires Stock Exchange) was cited as authority for the above.

To recapitulate, it clearly appears, from the foregoing, that *no* adjustments in price were made on account of loss of weight by shrinkage and that such adjustments as were made were on the basis of delivery of hides which were not within the stipulated average and extreme weight. It does not appear that the hides in issue were outside the range of average and extreme weights called for in the contract (as a matter of fact, the contract did not mention average and extreme weights), but, even if they were, it clearly appears that

the adjustment would be *in favor of the buyer*, i. e., the price per unit of shrunken hides would be *lower*, not higher, than called for in the contract.

Nevertheless, counsel for the defendant has persisted in an effort to mathematize a value for the hides at bar, as shown by the following argument in his brief (p. 11):

The involved hides were not sold with a guarantee of weight upon arrival at destination. They were sold on an estimated weight basis per hide (see consular invoices). The record discloses that in such cases an allowance in price would be granted where the average weight was not as contracted for.

Note, as indicated above, that *the contract does not call for an estimated weight basis per hide*, and that, even if it did, the allowance would be in favor of the buyer and would result in a lower price for the hides. In spite of this, the argument continues:

* * * Hence, as no allowance in price was made for the two shipments involved, the unit price of the merchandise, based upon its landed weight, is higher than the unit invoice price, based on its shipping weight.

This, of course, is extremely fallacious reasoning. Merchandise, such as or similar to that at bar, was *not* sold in the foreign market at a unit price *based upon its landed weight*, but was sold *only* at a unit price based upon its shipping weight, i. e., weight at the frigorifico, whether at that time it contained a normal or less than normal moisture content. The argument continues:

* * * The difference in value equals the loss of weight representing the said 6 to 7%.

There is absolutely nothing in the record which bears out this statement. If the statement refers to the adjustments which might be made, in the event the average and extreme weights of the hides in the shipment were not within the tolerances stipulated in the contract, which, as previously shown, have nothing to do with the real issue in this case, the record shows that, in such cases, the purchaser was entitled to a prorata *rebate*, calculated on the basis of a 1 per centum rebate on the agreed price for each ½-kilo shrinkage on the average per hide. (See translation of page 8, subexhibit 11, collective exhibit 19.) Note this is a rebate, not a surcharge. The argument continues:

* * * Thus, the hides were not in the same condition when landed as they were when shipped.

This is an undeniable truth, but it is not a factor or consideration where it is sought, as here, to determine *the value in the foreign market of hides in the condition of those landed in the United States*. Continuing:

The higher price indicated is in line with the answers to the hypothetical question wherein the higher price is stated to have been obtained for the lesser in weight of two similar packs.

As already pointed out, the answers to the hypothetical question stated that a "somewhat better price" (not further specified as to amount) was obtained only occasionally and "under favorable market conditions for the seller," which conditions, under the evidence in this case, did not exist at the time of exportation here pertinent. Continuing:

Accordingly, there is one price per pound, based on a shipping weight, and another price per pound based on a delivery weight.

This is absolutely untrue according to the evidence in this case which shows there was only one price per 100 kilos, based *only* upon weight at the frigorifico and that no price was quoted based upon delivery weight.

The argument concludes as follows:

* * * Hence, the price of the involved hides is higher on importation into the United States than the price thereof on exportation.

As hereinbefore stated, this inquiry is to determine the value or price of hides such as or similar to those here involved *in the foreign market*, not in the United States.

The argument is further sought to be developed by counsel for the defendant by means of a syllogism as follows: It is argued that because an allowance would be made in favor of the buyer when hides had an excessive amount of moisture, resulting in the buyer paying less per pound of hide, it must follow that when hides had a lesser amount of moisture than normal, and so weighed less, the buyer paid more per pound. This argument, of course, assumes a major premise that an excess or deficiency in moisture content gave rise to a change in the price of hides.

The fallacy of the argument is shown by defendant's own evidence which clearly establishes (1) that when hides were delivered containing less humidity than normal there was no allowance or adjustment in the price of the hides and (2) that where allowances or adjustments were made they had relation only to the question of average and extreme weights, and, furthermore, that the allowance or adjustment in such cases, whether of excess or deficiency in moisture, was in favor of the *buyer*.

Counsel for the defendant closes the argument with this observation:

The record also indicates, and the Court may consider, that the ceiling price established by the United States is a restriction or control which prevents the Argentine frigorificos from freely offering for sale, and selling these hides at prices in excess of 78 pesos per 100 kilos. Thus, there could be no freely offered for sale price for exportation to the United States, under the case of *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. (Customs) 131, C. A. D. 262.

Counsel for the defendant obviously overlooks the fact that the ceiling price referred to *was established by the United States*, not by

Argentina, and constituted no restriction upon the Argentine sellers or offerers in the free offer of their merchandise. They could freely offer their hides for sale at any price they wished, but United States purchasers were limited by their own Government to a ceiling price of 78 Argentine pesos per 100 kilos. The decision to offer the hides at that price was made by the Argentine sellers, manifestly on the basis that it was the best price they could get and was under no compulsion other than those factors which govern any market place.

Moreover, the *Graham & Zenger, Inc.*, case cited is not authority that the fixing of a ceiling price is a restriction or control preventing free offer for sale.

On the entire record before me, I find as facts:

(1) That the merchandise involved in these appeals for reappraisement is wet salted frigorifico sound bull hides, exported as two shipments from Buenos Aires, Argentina, on July 7, 1944, and entered in the United States on August 19, 1944.

(2) That between the date of exportation from Argentina and the date of weighing in the United States the hides in these shipments lost weight, due to the evaporation of water or moisture content or shrinkage, to the extent of the percentages of landed weight indicated by the appraiser in his appraisements herein.

(3) That at the time of exportation of the hides in question Buenos Aires was the principal market in Argentina for the sale of wet salted frigorifico sound bull hides such as or similar to those here in question both for home consumption in Argentina and for exportation to the United States.

(4) That at the said time of exportation hides such as or similar to those here in issue, i. e., wet salted frigorifico sound bull hides, which had shrunk to the extent of the percentages returned by the appraiser, were freely offered for sale for home consumption and for exportation to the United States to all purchasers in Buenos Aires, in the usual wholesale quantities and in the ordinary course of trade.

(5) That in the offer for sale as above stated of such or similar hides moisture or water content was not an element, either express or implied, affecting the offered price thereof.

(6) That the price, at the said time of exportation, at which hides such as or similar to those here involved were freely offered for sale under the conditions expressed in findings (4) and (5), including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, was 78 Argentine pesos per 100 kilograms, plus dutiable charges, as invoiced in the shipments here involved.

I conclude as matters of law:

I. That the foreign value, as defined in section 402 (c) of the Tariff Act of 1930, as amended, and the export value, as defined in section 402 (d) of the same act, of the hides at bar are the same.

II. That the proper basis for determining the value of this merchandise is such foreign and export value.

III. That such foreign and export value in each instance is the entered value.

Judgment will issue accordingly.